IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COMCAST CABLE COMMUNICATIONS CORPORATION, a Delaware company<br><br>Plaintiff,<br><br>v.<br><br>FINISAR CORPORATION, a Delaware corporation,<br><br>Defendant. | No. C 06-04206 WHA<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AS TO LACHES, POSTPONING CERTAIN RULINGS, AND DENYING DAMAGES EXPERT MOTION AS MOOT** |

**INTRODUCTION**

In this patent-infringement action, plaintiff moves for summary adjudication on the grounds of non-infringement, patent invalidity, and laches. For the reasons stated below, the patent owner has waited far too long to bring suit and its damages claims (before suit) are barred by the doctrine of laches.

**STATEMENT**

Plaintiff Comcast Cable Communications Corporation LLC, provides cable, information and entertainment services. It has operated and managed cable networks since 1963. Defendant Finisar Corporation provides fiber-optic subsystems and network-performance test systems. Finisar is the assignee of the '505 patent, which issued in 1995.

The '505 patent was drawn to a system for giving a large number of subscribers access to a comprehensive, virtually omniscient, digitized information database using a relatively small

amount of bandwidth. One of the invention's aims was to reduce two-way communications between the provider and subscribers over prior art systems. The patentee likened his invention to the main library of a large university such as Harvard or Yale (col. 2:9–23). The system, like such a library, provides the subscriber access to a huge amount of information. The subscriber, however, can only receive a small portion of the library at one time. To provide the broader access intended by the invention, subscriber stations download "root information" that subscribers use to access successively lower levels of indices used to subdivide and to reference the database. Information within the database is then transmitted to all subscribers. A filter system programmed to the requirements of each subscriber plucks out the data packets that the subscriber wants from the incoming data. The data packets are then downloaded into a storage system for later retrieval by the subscriber. Some information is sent more frequently, *i.e.*, repeated more than other information. Information that is in greater demand, for example, is sent at higher repetition rates.

This action commenced when Finisar sent a series of three letters to Comcast alerting it to the existence of the '505 patent. Finisar stated that it was interested in negotiating a license with Comcast. The first letter was fairly innocuous. The final letter included an ominous statement regarding a multimillion-dollar verdict Finisar had recently won in another action asserting the '505 patent against another company.

Comcast filed this action seeking declaratory judgment of non-infringement and invalidity of the '505 patent on July 7, 2006. Finisar's motion to dismiss the action for lack of a justiciable controversy was denied on November 9, 2006. Finisar's preliminary infringement contentions were due shortly thereafter. Finisar accused Comcast of infringing a single claim — claim 16 of the '505 patent. Later, Finisar moved to amend its preliminary infringement contentions to add claims 17, 20–22, and 24–26. The motion was granted on March 2, 2007. Claim 16, the only independent claim at issue, recited as follows (col. 21:34–68):

> 16. An information transmission system comprising the steps of: storing an *information database* on one or more memory devices;
>
> generating and storing on said memory devices a *hierarchically arranged set of indices for*

*referencing data in said information database*, including distinct indices for referencing distinct portions thereof, and embedding said indices in said information database;

scheduling transmission of selected portions of said information database, including assigning each selected portion of said information database one or more scheduled transmission times;

transmitting a stream of data packets containing said selected portions of said information database in accordance with said scheduled transmission times;

said scheduling step including dividing said selected portions of said information database into *a prioritized set of tiers, wherein all the selected portions of said information database in each tier are transmitted at a corresponding repetition rate*, wherein the repetition rate for higher priority tiers is higher than the repetition rate for lower priority tiers;

receiving said transmitted stream of data packets at subscriber stations;

at each subscriber stations, storing filter data corresponding to a subset of said indices, said filter data specifying a set of requested data packets which comprises a subset of said transmitted data packets; and

at each subscriber station, *downloading into a memory storage device* those of said received data packets which match said specified set of *requested* data packets.

In the claim construction order dated April 6, the Court construed the terms italicized above. Plaintiff now moves for summary judgment of non-infringement and for patent invalidity if plaintiff's motion for summary judgment for non-infringement is denied. Plaintiff also argues that defendant's infringement claims are barred by its laches defense.

**ANALYSIS**

**1.**   **NON-INFRINGEMENT AND INVALIDITY ISSUES.**

The Federal Circuit now has before it the same patent in a somewhat parallel case. Although it appeared earlier that we could proceed to decide other issues while waiting on others until the Federal Circuit decision, this order will now postpone even the tendered issues until we have the benefit of the appellate opinion.

**2. LACHES.**

In *A.C. Auckerman Co. v. R.L. Chaides Construction Co.*, 960 F.2d 1020, 1032 (Fed. Cir. 1992), the Federal Circuit stated: "[t]he application of the defense of laches is committed to the sound discretion of the district court." In invoking the defense of laches, an alleged infringer has the burden of proving the following two factors: (1) the patentee delayed filing suit for an unreasonable and inexcusable length of time from the time the patentee knew or reasonably should have known of its claim against the defendant, and (2) the delay operated to the prejudice or injury of the alleged infringer. *Ibid*.

The length of time required has no fixed boundaries but depends on the relevant circumstances and is measured from the time the patentee knew or reasonably should have known of the alleged infringing activities to the date of suit. Material prejudice to the alleged infringer may come in the form of economic prejudice where there is a "change in the economic position of the alleged infringer during the period of delay." *Id*. at 1033. A district court must also consider and weigh any justification offered by the patentee that may excuse its delay. Recognized justifications include the existence of other litigation, wartime conditions, and licensing negotiations. *Ibid*.

Patentees are expected to exercise due diligence with respect to their patent rights. Ignorance will not insulate a patentee from constructive knowledge that their patent rights are being infringed. As the Federal Circuit put it in *Wanlass v. General Elec. Co.*, 148 F.3d 1334, 1338 (Fed. Cir. 1998):

> [A] reasonable patentee, motivated by his interest in recovering for and preventing infringement, keeps abreast of the activities of those in his field of endeavor. Allocating the burden to patentees to seek out infringers is proper, furthermore, because compared to potential infringers, they are in the best position to know the scope of their patent protection and, therefore, also to know likely places to find infringement.

Constructive knowledge may be implied where there are "pervasive, open, and notorious activities" that a patentee would expect were infringing. "[S]ales, marketing, publication, or public use of a product similar to or embodying technology similar to the patented invention" gives rise to a duty to investigate whether there is infringement. *Ibid*.

4

### 1. PRESUMPTION OF LACHES.

Traditionally, courts have used the doctrine of laches to bar equitable claims by presumptively applying the relevant statute of limitations period applicable to the equitable causes of action at issue. *See Russell v. Todd*, 309 U.S. 280, 288 (1940). Such use was premised on the concept that equity should not aid a litigant who unreasonably and inexcusably delayed in bringing suit to the prejudice of the other party. "Although analogous statutes of limitations do not necessarily control, equity will look to the statute of limitations relating to actions at law of like character and usually act or refuse to act in comity with such statutes." *Int'l Tel. & Tel. Corp. v. General Tel, & Elecs. Corp.*, 518 F.2d 913, 926 (9th Cir. 1975), *rev'd on other grounds*, *California v. Am. Stores Co.*, 495 U.S. 271, 278 (1990).

In the patent infringement context, the relevant statute of limitations is found under 35 U.S.C. 286, which provides "no recovery shall be had for any infringement committed more than six years prior to the filing of the complaint or counterclaim for infringement in the action." Accordingly, while Section 286 proscribes patentees from seeking damages dating back to six years before the filing of their complaint, the six-year period for the presumptive application of the laches doctrine begins when the patentee knew or reasonably should have known of the allegedly infringing activity. This presumption supports the purpose animated by the laches doctrine: to ensure that patentees do not unreasonably delay suit and allow potential infringers to invest time and resources to what may ultimately be found infringing activity.

"By reason of the presumption, absent other equitable considerations, a prima facie defense of laches is made out . . . ." *A.C. Auckerman*, 960 F.2d at 1035. In the event that a prima facie defense is made out, the two critical factors that an alleged infringer must show to invoke the defense are presumed, meaning that the patentee is presumed to have unreasonably delayed in bringing suit and the delay is presumed to have operated to the prejudice or injury of the alleged infringer. In turn, the patentee may try to rebut either presumption. If the district court determines that laches does apply, the patentee is barred from seeking damages that accrued prior to the filing of the suit. *Id.* at 1037.

5

Applying the foregoing rule of decision to our record, this order holds that Finisar must have known, or certainly should have known, of its potential claims against Comcast at least six years before this action was filed (in November 2006). In a well-established nationwide business, Comcast had nearly 80,000 subscribers by the end of 1998, over 515,000 subscribers in 1999, and over one million subscribers by the end of 2000. The patent issued in 1995. Finisar's CEO, Jerry Rawls, admits that since its inception and issuing, Finisar always thought that the '505 patent had particular relevance to the field of broadcasting digital television. During Rawls' deposition, in regards to the relevance of the '505 patent, he stated:

> We've always thought it relevant. I think — you've read the patent, and I think in there is talks about some references to — to video and television and cable television and — so I think from the very beginning, television, but all forms of data were — were all part of the — what was envisioned (Rawls Dep. 73:13–18).

Significantly, Finisar's own expansive view of its patent necessarily covered Comcast's digital television system, for Finisar's view of its invention meant then and now that Comcast could only operate as it openly does by infringing — there was no practical non-infringing way to avoid the patent. Finisar's damage study essentially argues that Comcast could not offer any marketable form of digital television without violating the patent in suit. This contention is made to raise the supposed royalty rate as high as possible. Under Finisar's expansive view of the matter, Finisar has no excuse for being unaware that Comcast was allegedly infringing back in 1998. Since 1998, Comcast has plainly provided such a system. As Finisar's expert, Roy Griffin, stated:

> I don't know what you do if you didn't implement [Comcast's system] in this manner, in the '505 patent manner. If there is a way of doing that, I don't know what it is (Krishnan Decl. Exh. 4 at 186:14–17).

In their opposition brief, Finisar explains that Griffin meant that he could not think of a non-infringing alternative to "providing 100's of channels, electronic program guides, software and other data to a large number of subscribers," as Comcast's system does (Opp. 12). If Finisar's own expert could not come up with a non-infringing alternative, at the minimum Finisar should have been aware of circumstances that might lead it to believe that Comcast's

6

system was infringing. Comcast made no secret that it was broadcasting hundreds of digital channels with electronic program guides to thousands of customers every day.

At the hearing on this motion, Finisar's counsel bobbed and weaved, backing up to the position that it was possible to broadcast digital television without infringing the '505 patent, but that in order to do so a cable service provider would have to broadcast each individual channel on its own frequency. Such a method of broadcast, however, would provide few, if any, of the benefits of broadcasting television digitally (*e.g.*, transmitting larger volumes of information and channels without using too much bandwidth) than the former analog method, making it entirely infeasible and costly for companies like Comcast to implement. Such a system is entirely impracticable.

The bottom line is that Finisar should have known, given the broad scope it attaches to the patent claims, that Comcast's system fell within the supposed breadth of the claims. It does not matter that this Court may cut back on that scope. Finisar claims to have believed for many years that the claims in suit were broad and were broad enough to catch the Comcast system as known to the public long ago.

In sum, Comcast's open and notorious service offerings combined with Finisar's own expansive view of the scope of its patent rights indicates that Finisar was well on notice of its rights against Comcast at least six years before the filing of this action. As such, a prima-facie case for laches has been established and the critical factors of inexcusable delay by Finisar and prejudice to Comcast are presumed. Finisar may negate these presumptions but, as shown below, has not done so.

### B. No Excusable Justification.

Finisar offers several reasons to justify its delay in bringing its infringement claims, all of which are insufficient. *First*, as an initial matter, Finisar maintains that 515,000 customers in 1999 is "hardly 'open, persuasive and notorious' in light of Comcast's 5.7 million cable user[s]" now so as to put it on notice of its rights. That is not the test. Under Finisar's reasoning, if Comcast's customers reached 100 million in several years, their current customer base of 5.7

7

million would be insignificant to show notorious use because 5.7 million is small in comparison to 100 million. Comcast's system was well known in 1998.

*Second*, Finisar further asserts that it should not be charged with knowledge of an "industry not its own" (Opp. 22). Finisar's argument lacks legal support. As a patentee, Finisar may be charged with knowledge of infringing activities not only of industries for which it is involved, but also for industries in which its patent has applications. *See Wanlass*, 148 F.3d at 1338 (Fed. Cir. 1998) ("The patentee who is negligently or willfully oblivious to these types of activities cannot later claim his lack of knowledge as justification for escaping the application of laches because the law imputes knowledge when opportunity and interest, combined with reasonable care, would necessarily impart it"). Finisar's involvement in the cable television industry was also not as attenuated as Finisar maintains. While it may not have been directly providing digital broadcasting services to customers, it was significantly involved in the cable television industry as a whole. Finisar regularly provided cable companies with cable television transmission products during the mid 1990's. Regarding Finisar's sale of cable transmission products, Finisar's founder and former chairman, Frank Levinson, stated:

> So we owned, we owned or rented, but by 'owned,' I mean, it was in our building everyday, substantial amounts of cable TV gear at some point during the early '90s. . . . And for two years [during the mid '90s] it was the second largest business we had (Levinson Dep. 462:9–20).

Although such business activity does not show head-on competition with digital television service providers, it does show that Finisar had general knowledge and know how of the cable-television market.

*Third*, Finisar insists that it was under no duty to investigate Comcast's system because infringement was not apparent from the product itself. As Finisar puts it, "nothing in the law requires Finisar, which is not even a cable company competitor, to scour press releases, obtain products being 'tested' in selected markets across the country and pull them apart to investigate for infringement" (Opp. 2). Finisar's argument is ill-founded. The case law is clear that Finisar was under a duty to investigate the circumstances associated with possibly infringing activities. This duty includes testing possibly infringing devices to explore whether or not they read on the

claims of the patent. *See Wanlass*, 148 F.3d at 1339–40 (applying the laches defense and rejecting the patentee's argument that it would have been too burdensome to test the allegedly infringing device). Finisar's argument that it was under no duty to test Comcast's set-top boxes is thus not supported by the law. We must remember that Finisar's own expansive view of the claims in suit necessarily meant that Comcast infringed simply based on the basics of the Comcast system as publicly known.

*Fourth*, Finisar contends that it was involved in extensive licensing efforts that delayed its ability to bring suit (Krishnan Decl. Exh. 13 at 5–6). While licensing negotiations has been recognized as a justifiable excuse in the laches context, such negotiations must have been between the patentee and alleged infringer. *See A.C. Auckerman*, 960 F.2d at 1038 (expressly limiting the excuse of ongoing licensing negotiations to those negotiations "with the accused"). It is undisputed that Finisar first contacted Comcast regarding licensing the '505 patent in February 2005, over seven years after Comcast's alleged infringement began (Krishnan Decl. Exh. 13 at 5–6). Comcast's alleged licensing negotiations, thus, have no bearing on the application of Comcast's laches defense.

*Fifth*, Finisar argues that because it was involved in litigation over this patent with DirectTV, it should be excused from any delay in filing suit against Finisar (Opp. 23). Litigation against other alleged infringers is a recognized excuse for delaying suit by a patentee because such litigation may take up a patentee's time and resources to the point where pursuing other infringers is difficult. *See A.C. Auckerman*, 960 F.2d at 1039. The complaint against DirectTV, however, was not filed until April 2005 (Krishnan Decl. Exh. 9), over six years after Finisar should have known of its rights against Comcast.

As Finisar has offered no acceptable justifications excusing its delay in bringing this action and has also failed to provide any affirmative evidence to rebut the presumption that its delay prejudiced Comcast, plaintiff's motion for summary judgment as to its laches defense is **GRANTED**. Defendant is barred from seeking damages that accrued prior to the filing date of their infringement claims, **NOVEMBER 22, 2006**.

**3. DAMAGE STUDY.**

Comcast has moved to strike Finisar's damage study as too deficient to go to the jury. Since all pre-suit damages have been stricken, the issue is moot. Finisar may redo its study. The allowable damages period will run from the commencement of the action to December 31, 2007. This must be done by **FEBRUARY 22, 2008**. The opposing expert may then serve a counter report within **FOURTEEN CALENDER DAYS**. Please work out deposition dates among counsel. Both sides may then file motions in limine as to the experts. Please do not bring motions to strike. If the next report is inadmissible, then very possibly, there will be no further opportunity to cure. In other words, if an expert takes too extreme or too unjustifiable of a position on a few of the damage issues, then the report may be limited at the final pretrial conference without further opportunity to cure. To allow premature motions to strike simply encourages both sides to take extreme positions with the expectation that if the judge objects to the position they can always fall back to a reasonable position. After the Federal Circuit decision, a case management conference will set a new trial date. For now, a new case management conference is set for **MARCH 20, 2008, AT 11:00 AM**.

**CONCLUSION**

For the above-stated reasons, plaintiff's motion for summary adjudication as to its laches defense is **GRANTED**. Rulings on the issues tendered for non-infringement and invalidity will be postponed and plaintiff's motion to strike defendant's damage report is moot.

**IT IS SO ORDERED.**

Dated: January 17, 2008.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

10