IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COMCAST CABLE COMMUNICATIONS CORPORATION, a Delaware company<br><br>Plaintiff,<br><br>v.<br><br>FINISAR CORPORATION, a Delaware corporation,<br><br>Defendant. | No. C 06-04206 WHA<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT OF INVALIDITY** |

## INTRODUCTION

In this patent-infringement action, plaintiff moves for summary adjudication on the grounds of invalidity and non-infringement. For the reasons stated below, plaintiff's motion for summary judgment of invalidity is **GRANTED**. This order therefore need not address plaintiff's motion for summary judgment of non-infringement.

## STATEMENT

Plaintiff Comcast Cable Communications Corporation LLC, provides cable, information, and entertainment services. It has operated and managed cable networks since 1963. Defendant Finisar Corporation provides fiber-optic subsystems and network-performance test systems. Finisar is the assignee of United States Patent No. 5,404,505, which issued in 1995.

This action commenced when defendant Finisar sent a series of three letters to plaintiff Comcast alerting it to the existence of the '505 patent. Finisar stated that it was interested in

negotiating a license with Comcast. The first letter was fairly innocuous. The final letter included an ominous statement regarding a multimillion-dollar verdict Finisar had recently won in another action asserting the '505 patent against another company. That action is discussed further below.

Comcast filed this action seeking declaratory judgment of non-infringement and invalidity of the '505 patent on July 7, 2006. Finisar's motion to dismiss the action for lack of a justiciable controversy was denied on November 9, 2006. Finisar's preliminary infringement contentions were due shortly thereafter. Finisar accused Comcast of infringing a single claim — claim 16 of the '505 patent. Later, Finisar moved to amend its preliminary infringement contentions to add claims 17, 20–22, and 24–26. The motion was granted on March 2, 2007. A claim construction order was subsequently issued construing six terms selected by the parties. Each of the six terms construed appeared in claim 16 — the only independent claim being asserted.

After continued discovery, the case was teed up for summary judgment. The parties informed the Court, however, that the Federal Circuit had the same patent-in-suit before it in a somewhat parallel case (*Finisar v. The DirectTV Group, Inc.*) and that many of the issues that would be presented on summary judgment in this action would be addressed by the Federal Circuit. As such, the parties were requested to only address those issues for summary judgment that could be parsed out from those the Federal Circuit would decide. Comcast then moved for summary judgment of invalidity, non-infringement, and on its laches defense. An order dated January 17, 2008, granted Comcast's motion as to its laches defense and postponed decision on all remaining issues having determined that it would benefit from the upcoming appellate opinion.

On April 18, 2008, the Federal Circuit handed down its decision in the *DirectTV* litigation. That decision held that claim 16 of the '505 was anticipated by a 1983 textbook written by Dr. Jan Gecsei. In light of that ruling, Finisar stipulated herein that it would assert only claim 25 against Comcast. All other asserted claims were dropped from this suit. Claim 25 depends from claim 24, which depends from claim 16. Because claim 25 was not asserted in

the *DirectTV* litigation, it was not addressed in the Federal Circuit decision. In a *non*-final office action in a pending reexamination for the '505 patent, however, the PTO found claim 25 as also anticipated by the Gecsei reference. That non-final office action was made on February, 19, 2008. Comcast now moves for summary judgment of invalidity and non-infringement of claim 25.

\*          \*          \*

The '505 patent was drawn to a system for giving a large number of subscribers access to a comprehensive, virtually omniscient, digitized information database using a relatively small amount of bandwidth. One of the invention's aims was to reduce two-way communications between the provider and subscribers over prior art systems. The patentee likened his invention to the main library of a large university such as Harvard or Yale (col. 2:9–23). The system, like such a library, provided the subscriber access to a huge amount of information. The subscriber, however, could only receive a small portion of the library at one time. To provide the broader access intended by the invention, subscriber stations downloaded "root information" that subscribers could use to access successively lower levels of indices used to subdivide and to reference the database. Information within the database was then transmitted to all subscribers. A filter system programmed to the requirements of each subscriber plucked out the data packets that the subscriber wanted from the incoming data. The data packets were then downloaded into a storage system for later retrieval by the subscriber. Some information was sent more frequently, *i.e.*, repeated more than other information. Information that was in greater demand was sent at higher repetition rates.

Claim 16, which has already been found to be anticipated, recited as follows (col. 21:34–68):

> 16. An information transmission system comprising the steps of:
>
> storing an *information database* on one or more memory devices;
>
> generating and storing on said memory devices a *hierarchically arranged set of indices for referencing data in said information database*, including distinct

3

>indices for referencing distinct portions thereof, and embedding said indices in said information database;
>
>scheduling transmission of selected portions of said information database, including assigning each selected portion of said information database one or more scheduled transmission times;
>
>transmitting a stream of data packets containing said selected portions of said information database in accordance with said scheduled transmission times;
>
>said scheduling step including dividing said selected portions of said information database into *a prioritized set of tiers, wherein all the selected portions of said information database in each tier are transmitted at a corresponding repetition rate*, wherein the repetition rate for higher priority tiers is higher than the repetition rate for lower priority tiers;
>
>receiving said transmitted stream of data packets at subscriber stations;
>
>at each subscriber stations, storing filter data corresponding to a subset of said indices, said filter data specifying a set of requested data packets which comprises a subset of said transmitted data packets; and
>
>at each subscriber station, *downloading into a memory storage device* those of said received data packets which match said specified set of *requested* data packets.

In the claim construction order dated April 6, 2007, the Court construed the terms italicized above.

## ANALYSIS

**1.   LEGAL STANDARD.**

    **A.   Summary Judgment.**

Summary judgment is granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FRCP 56(c). A district court must determine, viewing the evidence in the light most favorable to the non-moving party, whether there is any genuine issue of material fact. *Giles v. General Motors Acceptance Corp.*, 494 F.3d 865, 873 (9th Cir. 2007). A genuine issue of fact is one that could reasonably be resolved, based on the factual record, in favor of either

4

party. A dispute is "material" only if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). "In a patent case, as in any other, summary judgment may be granted when there are no disputed issues of material fact, or when the non-movant cannot prevail on the evidence submitted when viewed in a light most favorable to it." *Knoll Pharmaceutical Co., Inc. v. Teva Pharmaceuticals USA, Inc.*, 367 F.3d 1381, 1384 (Fed. Cir. 2004).

### 2.   OBVIOUSNESS.

A patent is presumed valid, and the burden of establishing invalidity as to any claim of a patent rests upon the party asserting such invalidity. 35 U.S.C. 282. Invalidity must be proven by clear and convincing evidence. Although not susceptible to precise definition, "clear and convincing" evidence has been described as evidence which produces in the mind of the trier of fact "an abiding conviction that the truth of [the] factual contentions are 'highly probable.'" *Builder, Inc. v. Kason Indus., Inc.*, 849 F.2d 1461, 1463 (Fed. Cir. 1988).

Under 35 U.S.C. 103, a patent may not be obtained if the difference between the claimed invention and the prior art would have been "obvious" at the time the invention was made to a person having ordinary skill in the art to which the patent is directed. The Supreme Court recently addressed the issue of obviousness in *KSR International Co. v. Teleflex Inc.*, 127 S.Ct. 1727 (2007). There, the Supreme Court reversed the Federal Circuit's rejection of summary judgment of obviousness emphasizing the importance of employing a pragmatic and flexible approach to obviousness: "[a] person of ordinary skill is also a person of ordinary creativity, not an automaton." *Id*. at 1742. The Supreme Court further stressed that if a person having ordinary skill in the art would have been able to implement a predictable variation of the prior art to yield the claimed invention, Section 103 would likely bar patentability. "Often, it will be necessary for a court to look to interrelated teachings of multiple patents; the effects of demands known to the design community or present in the marketplace; and the background knowledge possessed by a person having ordinary skill in the art, all in order to determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue." *Id*. at 1740–41. "In many fields there may be little discussion of obvious techniques or

combinations, and market demand, rather than scientific literature, may often drive design trends. Granting patent protection to advances that would occur in the ordinary course without real innovation retards progress and may, for patents combining previously known elements, deprive prior inventions of their value or utility." *Id*. at 1732. The Supreme Court also elaborated on the role of expert declarations in the context of obviousness:

> To the extent the [Federal Circuit] misunderstood the *Graham* approach to exclude the possibility of summary judgment when an expert provides a conclusory affidavit addressing the question of obviousness, it misunderstood the role expert testimony plays in the analysis. In considering summary judgment on that question the district court can and should take into account expert testimony, which may resolve or keep open certain questions of fact. That is not the end of the issue, however. The ultimate judgment of obviousness is a legal determination.

*Id*. at 1745. A district court must therefore collectively look to the content of the prior art, the scope of the patent, and the ordinary level of one skilled in the art when assessing the ultimately legal question of obviousness.

While a prior art reference "must be enabling in order to qualify as an anticipatory reference under Section 102(b), a reference may qualify as a prior art reference under Section 103 even if it is non-enabling." *Symbol Technologies, Inc. v. Opticon, Inc.*, 935 F.2d 1569, 1577 (Fed. Cir. 1991); *see also Beckman Instruments, Inc. v. LKB Produkter AB*, 892 F.2d 1547, 1551 (Fed. Cir. 1989)("[e]ven if a reference discloses an inoperative device, it is prior art for all that it teaches.")

The Federal Circuit has already found "as a matter of law the elements of claim 16, arranged as in claim 16, are part of [the] prior art" with respect to the remaining claims in the '505 patent. *Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323, 1339 (Fed. Cir. 2008). Specifically, the Federal Circuit found each element of claim 16 present in a prior art textbook written by Jan Gecsei in 1983 titled "The Architecture of Videotex Systems." This order therefore need only address the further limitations added by claim 25 and claim 24 (which claim 25 depends from). Claim 24 stated:

> 24. The information transmission method of claim 16, wherein

> said transmitting step transmits said data packets using *multiple transmission channels*;
>
> and said receiving step includes *receiving data packets from selected ones of said multiple transmission channels*.

Claim 25 stated:

> 25. The information transmission method of claim 24, wherein
>
> said information database includes *video program materials as well as non-video information*;
>
> said transmitting step transmits data packets containing at least *selected portions of said video program materials on at least one of said multiple transmission channels and transmits primarily non-video information on at least one other one of said multiplicity of transmission channels*;
>
> and
>
> at a multiplicity of said subscriber stations, receiving and storing video program materials.

Claims 24 and 25 thus essentially added four further limitations beyond claim 16. *First*, data in the system must be capable of being transmitted across multiple transmission channels. *Second*, the subscriber stations must be capable of receiving data on multiple transmission channels. *Third*, the database containing the information being transmitted must include both video program materials and non-video information. *Fourth*, one of the multiple channels transmitted must contain selected portions of the video program materials and another channel must be primarily designated for transmitting non-video information.

    Under the practical test propounded by the Supreme Court, this order finds that claim 25 would have been obvious to one skilled in the art at the time of invention (*i.e.*, 1991). In particular, all of the additional limitations added by claims 24 and 25 were disclosed in a 1982 textbook written by Dr. John Tydeman entitled "Teletext and Videotex in the United States." The Tydeman reference was expressly cited in Gecsei — the textbook found to have anticipated claim 16 (Ciciora Decl. Exh. 2). Both references were directed at the same subject matter — *i.e.*, teletext (or videotex) systems. Teletext was essentially a service provided by broadcasting companies where data relating to television shows was transmitted during the "vertical blanking interval" of broadcast — *i.e.*, the time between video fields in an analog television signal (*id.* at

7

1  ¶ 7). An example of a main teletext page used by the British Broadcasting Company in 1983 is
2  shown below:



13  After accessing the main page, the user could navigate to a page of choice (*e.g.*, News Headline
14  at 101) to obtain their desired information.



25  Teletext was introduced by the BBC in the late 1970's and became increasingly popular outside
26  of the United States throughout the 1980's.
27      Although Tydeman was primarily aimed at describing existing teletext/videotex
28  systems, it clearly disclosed each limitation of claim 25. *First*, Tydeman taught that data could

be transmitted across multiple transmission channels. As stated in Tydeman, "there is no theoretical limit to the number of channels that can be distributed on a coaxial cable system" (Ciciora Decl. Exh. 2 at 110). *Second*, Tydeman explained that with the emergence of digital television "teletext/videotex decoders" and "digital TV receivers" could be incorporated at user stations to receive broadcasted transmissions (*id*. at 125). In fact, an entire chapter in Tydeman was dedicated to discussing "User Terminals." *Third*, as set forth in Tydeman, the data being transmitted could consist of video program materials and non-video information (*id*. at 105 and 113–14):

> There have also been two recent developments in television technology, both of which are likely to filter into the mass consumer market during the next two decades. One is the development of digital video systems; the other is high-definition television (HDTV). . . Full-motion video will replace existing slow scan video and graphic/text displays.
>
> \*       \*       \*
>
> Cable television is currently experiencing rapid growth. During the next two decades, cable television distribution networks will become a major medium for distributing teletext and videotex services. The availability of a large bandwidth communication link on todays's coaxial cable system (and tomorrow's fiber optic systems) makes possible the eventual inclusion of full-motion digital video signals in teletext and videotex systems.

Tydeman thus expressly disclosed the transmission of both video programs (*i.e.*, digital television) and non-video information (*i.e.*, teletext/videotex) in one system. *Fourth*, separate transmission channels could be dedicated to the video and non-video data respectively (*id*. at 110) (emphasis added):

> The decreasing cost of microelectronics is likely to favor the adoption of even closer amplifier spacings in future cable systems, providing further increases in the number of channels available (Figure 7.3). The availability of such large numbers of television channels makes it possible to *dedicate complete channels for teletext/videotex services*.

It was envisaged, therefore, that entire channels would be dedicated to non-video or video content.

It is worth noting here that Finisar has purposefully taken a broad view of the scope of its patent to augment its alleged damages. At the last summary judgment hearing, Finisar's

9

1  counsel was asked if there was any way to transmit digital television without infringing the '505
2  patent. Counsel responded, "you could do non-infringing digital TV by assigning each channel
3  one frequency, and having a scroll guide" (Tr. 38:11–39:1). As was previously recognized by
4  the last summary judgment order (Dkt. 176 at 7):

> Such a method of broadcast, however, would provide few, if
> any, of the benefits of broadcasting television digitally (*e.g.*,
> transmitting larger volumes of information and channels
> without using too much bandwidth) than the former analog
> method, making it entirely infeasible and costly for companies
> like Comcast to implement.

It thus appears as though Finisar believes that there is no way Comcast could provide normal digital broadcasting services without infringing the '505 patent.

Finisar argues that Tydeman does not qualify as prior art because it is not an "enabling" reference, but rather merely eludes to what future television broadcasts may include. Finisar misses the mark. In assessing obviousness, the knowledge one skilled in the art must be evaluated at the time of the invention, *not* at the time of the prior art reference. *See Takeda Chemical Industries, Ltd. v. Alphapharm Pty., Ltd.*, 492 F.3d 1350, 1362–63 (Fed. Cir. 2007). Finisar itself admits that by 1991 — the year the '505 patent was filed — digital video transmission had become feasible due to advances in the art not attributable to the '505. Given these advances (as specifically forecasted by Tydeman), one skilled in the art in 1991 would have been able to read Tydeman as disclosing each element of the claim 25.

It is true that Tydeman may not have taught the precise broadcast of digital television as embodied in Comcast's cable offerings for which Finisar maintains is covered by claim 25. But this is not the test. A single obvious embodiment of a claim is sufficient to invalidate the entire claim even if the claim would also cover not-so-obvious embodiments. *See Atlas Power Co. v. Ireco Inc.*, 1342, 1346 (Fed. Cir. 1999). Tydeman disclosed that one could broadcast teletext data (*i.e.*, non-video information) with digital television (*i.e.*, video information) in one system. By the time the '505 patent was filed, the transition to digital television was inevitable. One skilled in the art would have recognized, as disclosed in Tydeman, that a teletext system could have been incorporated into digital broadcast to allow for at least two channels — one with

10

1 video information and one with non-video data. This is sufficient to meet an embodiment of
2 claim 25.

3 Finisar also relies on the declaration of its expert, Dr. Randy Katz. There, Dr. Katz
4 stated (Katz. Decl. ¶ 24):

> Thus, it was not obvious to those of ordinary skill in the art to go to a scheduled transmission system in which selected portions of the information in the database, including the video programming, would be organized into tiers and then scheduled for transmission so that each tier has a corresponding transmission repetition rate. Once the transmission of digital video programming became feasible as a result of increased bit rates and sophisticated data compression techniques, the conventional wisdom of those of ordinary skill in the art was that video programming, just like textual information, should be provided to subscribers on an on-demand basis. The '505 patent departed from the conventional wisdom of its time.

12 This may be true, but irrelevant. Dr. Katz is only speaking to the issue of whether one skilled in
13 the art in 1991 would have thought that digital video had to be provided on an on-demand basis
14 — *i.e.*, only when the user requests it. The transmission repetition rate referred to by Dr. Katz
15 is an element of claim 16, which has already been invalidated. Dr. Katz's statement simply
16 does not apply to all television transmissions. It does not address the issue of using existing
17 1991 technologies with television to transmit data.

18 Finisar further states that "[b]y 1991, when digital video had become possible, one
19 skilled in the art would not have looked back to antiquated teletext transmission schemes and to
20 use them for digital transmission" (Opp. 14). Finisar's argument is unconvincing for a person
21 of ordinary skill in the art is presumed to assess obviousness with full knowledge of *all* the
22 pertinent prior art. *See Custom Accessories, Inc. v. Jeffrey-Allan Industries, Inc.*, 807 F.2d 955,
23 962 (Fed. Cir. 1986) ("The person of ordinary skill is a hypothetical person who is presumed to
24 be aware of all the pertinent prior art."). Finisar cannot evade this presumption by supposing
25 that real-world artisans would have needed memory pills to drudge up mental images of older
26 references. The presumption eliminates the need for memory pills. Instant, full, and accurate
27 recall of every item of prior art must be taken for granted.

28

11

1    Regardless of whether Tydeman was an "antiquated" reference, it is presumed to be
2 within the knowledge of the person of ordinary skill for obviousness purposes.  In addition,
3 Finisar's position is directly undermined by the fact that the Federal Circuit has already found
4 Gecsei to be an anticipatory reference for claim 16 of the same patent.  Gecsei came only two
5 years after Tydeman, was directed at the same subject matter (*i.e.*, teletext/videotex systems),
6 and expressly cited to Tydeman.

7    Finisar next argues that Tydeman should be discounted because it teaches away from the
8 claimed invention.  Finisar primarily relies on two points.  It first argues that because Tydeman
9 stated that "full-motion video will replace existing slow scan video and graphics/text" that it
10 somehow implied that Tydeman envisaged only video transmissions without non-video
11 information (Ciciora Decl. Exh. 2 at 105).  Finisar goes on to state that nowhere in Tydeman
12 does it disclose an "integrated" system.  Besides the above-quoted sentence, Finisar cites to no
13 support.  Nor can it.  The claim construction order stated "the database must be integrated, that
14 is, it must be accessible using a single structure."  As evidenced by the language quoted earlier
15 in this order, Tydeman is clear in stating that teletext/videotex systems can be integrated into
16 digital video transmissions: "digital video will permit greatly enhanced teletext/videotex
17 systems" (*ibid.*).  Whole channels could be dedicated to non-video information with others
18 dedicated to video transmission in *one* system.  Tydeman goes on to explain that users could
19 access the information with "digital TV receivers" in their homes.  It would be a far leap to
20 conclude that one indefinite statement taken in isolation would by itself eviscerate everything
21 else disclosed in Tydeman.  Next, Finisar contends that Tydeman teaches away from the
22 claimed invention because it does not disclose the possibility of scheduled transmission times as
23 recited in claim 16 (which has already been found in Gecsei), but instead emphasizes that
24 transmission times for teletext/videotex systems are based on a number of different variables.
25 Specifically, Tydeman stated (*id*. at 4–5):

26    [I]nformation is 'cycled' by the broadcast station. Access time,
       the delay between requesting a page and seeing it on the
27    screen, depends on the number of pages being cycled, the rate
       of transmission (the bit rate), the number of TV lines dedicated
28    to carrying the information to the viewer, the amount of

12

memory in the decoder, and the "importance" of the information.

This passage simply does not teach away from the claimed invention. Just because the "access times" are determined by a number of variables does not mean it teaches away from the "scheduled transmissions" of claim 16. Presumably, every system that transmits data has various criteria that may influence the user's access time to the data. That Tydeman discloses such criteria does not by implication mean that it teaches away from a "scheduled" transmission as stated in claim 16.

Finisar next relies on secondary considerations. "Secondary considerations, when present, must be considered in determining obviousness." *Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 667 (Fed. Cir. 2000). In support of its showing of secondary considerations, Finisar contends, in a rather conclusory fashion, that experts were skeptical that the conversion from analog to digital conversion could be accomplished and that the invention was commercially successful. The only support Finisar cites for its industry skepticism argument is a rather unhelpful quote from Comcast's expert stating generally that people sometimes incorrectly assume that everything can be done digitally. How such an over-broad statement somehow demonstrates that the industry was skeptical of the purported teachings in the '505 patent is beyond reason. Next, to show commercial success Finisar solely relies on Comcast's success in offering cable services. Finisar has not, however, made any proper showing that the success of Comcast's cable system was attributable to the teachings of the '505 patent *See Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*, 776 F.2d 281, 306 n.42 (Fed. Cir. 1985) (Evidence of secondary considerations only has probative value where there is "a nexus between the merits of the claimed invention and the secondary consideration"). Even assuming *arguendo* that Finisar did make such a showing, it would not be enough to preclude summary judgment given the strong showing of obviousness here. *See Leapfrog Enters. v. Fisher-Price, Inc.*, 485 F.3d 1157, 1162 (Fed. Cir. 2007).

In a last-ditch effort, Finisar maintains that a person of ordinary skill in the art would not have been motivated to combine the teachings of Gecsei with Tydeman. Finisar's argument is entirely baseless. As already stated, Gecsei expressly cited to Tydeman and both references

13

relate to the same subject matter. These references collectively disclosed every limitation of claim 25.

## CONCLUSION

For the above-stated reasons, this order finds claim 25 as obvious in light of the prior art. Plaintiff's motion for summary judgement is therefore **GRANTED**. This action is now completely over. Judgment will be entered for Comcast.

**IT IS SO ORDERED.**

Dated: July 11, 2008.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE